## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**UNITED STATES OF AMERICA,**
*ex rel.* **KATHI HOLLOWAY, Relator**                          **PLAINTIFF**

**V.**                                    **CIVIL ACTION NO. 3:10CV1875**
                                          **District Judge James G. Carr**

**HCR MANORCARE, INC.,**
**HCR HOME HEALTH CARE & HOSPICE, LLC,**
**HEARTLAND HOSPICE SERVICES, LLC, and**
**MANORCARE HEALTH SERVICES, LLC**              **DEFENDANTS**


### FIRST AMENDED COMPLAINT

#### Jury Trial Demanded

*Qui tam* relator, Kathi Holloway, by her undersigned attorneys, and pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, hereby submits as her First Amended Complaint in this action the following, in order further to inform the Court and the Defendants of the context and nature of the transactions and occurrences alleged by Holloway on her own behalf, and on behalf of the United States, in her original Complaint filed herein on August 24, 2010:

1.   This is a civil action brought on behalf of the United States of America against  HCR ManorCare, Inc. ("HCR"), HCR Home Health Care & Hospice, LLC, Heartland Hospice Services, LLC and ManorCare Health Services, LLC,  to recover

damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733

("FCA"), as amended by the False Claims Act Amendments of 1986, the Fraud

Enforcement and Recovery Act of 2009, and the Patient Protection and Affordable

Care Act of 2010.

2.      Relator Kathi Holloway ("Holloway"), brings this action under the "*qui*

*tam*" provisions of the FCA, and thus on her own behalf as "Relator" as well as on

behalf of the United States.

## I. Venue and Jurisdiction

3.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345

and 31 U.S.C. §§ 3730(b) and 3732(a).

4.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and

31 U.S.C. § 3732(a).  The Defendants were all doing business in this District and

Division during all relevant time periods, and the claims set forth herein arose

substantially in this District and Division.

## II. The Parties

5.    *Qui tam* relator Kathi Holloway is an adult citizen of the United States and

a resident of the State of Nevada.  By virtue of her marriage in 2011, she is now

known as Kathi Holloway Cordingley.  Dr. Holloway earned a Bachelor of Science

in Nursing and is currently licensed as a Registered Nurse in good standing in the

2

States of Arizona and Nevada.  She also  earned a Masters Science Management Degree, and a PhD in Human Services with a Specialization in Health Care. Continually since 1999, and thus throughout almost three decades, Dr. Holloway has been engaged by numerous different companies operating hospices, either being employed as an administrator or compliance officer, or being engaged as a consultant and independent contractor.  Those hospice companies have included Odyssey Hospice (based in Kansas City, Missouri), Hospice South (based in Memphis, Tennessee), Grace Hospice (based in Kansas City, Missouri), Vitas Hospice (also based in Kansas City), Good Shepherd Hospice (also based in Kansas City), Heartland Hospice (based in many locations, including Kansas City), Nathan Adelson Hospice (based in Las Vegas, Nevada), Solari Hospice (also based in Las Vegas), American Hospice (operating in numerous cities throughout the  United States), Arizona Family Hospice (based in Scottsdale, Arizona), and Serenity Hospice (operating throughout Georgia).  Each time Dr. Holloway was recruited for or sought out each such position at each such hospice organization, she sought to work with an organization that was compliant with the Medicare payment rules in which she had become an expert. She never agreed to begin any such engagement with a belief that the hospice organization was not compliant with those Medicare rules.  She also never agreed to begin work with any such company with a purpose of disclosing

3

fraudulent practices to federal authorities. Dr. Holloway is now President of Cordingley Hospice Consultants, LLC, a Nevada limited liability company, through which she continues to serve as a consultant in the proper management of lawful hospice operations.

6.     Defendant HCR ManorCare, Inc. is a large health care conglomerate based in and operated out of Toledo, Ohio.  Its corporate headquarters is at 333 North Summit Street in Toledo, from which it and its affiliates conducted many of the activities described below.  One of the health care enterprises owned and operated ultimately by HCR ManorCare is a network of hospice agencies or facilities. HCR ManorCare, Inc. owns and ultimately controls all of the remaining Defendants herein. For that reason, all of the Defendants in this action shall often be referred to hereafter as "Heartland" (or "Heartland Hospice"), as HCR ManorCare uses that brand name in its hospice operations.  Any use of "Heartland" herein shall refer to the control by HCR ManorCare Inc. of all of the activities and decisions described herein, and executed by HCR ManorCare Inc. directly or through one or more of the remaining Defendants. HCR ManorCare Inc. has previously waived formal service of process in this proceeding through its attorney and agent authorized for that purpose.

7.     HCR Home Health Care and Hospice, LLC, is an Ohio Limited Liability Company owned and operated entirely by Defendant HCR ManorCare, Inc.  It too

maintains its corporate headquarters at 333 North Summit Street, Toledo, Ohio. It may be served with process through its Registered Agent, CT Corporation Systems, 400 Easton Commons Way, Suite 125, Columbus, Ohio.

8.     Heartland Hospice Services, LLC, is also an Ohio Limited Liability Company owned and operated entirely by Defendant HCR ManorCare, Inc.  It too maintains its corporate headquarters at 333 North Summit Street, Toledo, Ohio, and it too may be served with process through its Registered Agent, CT Corporation Systems, 400 Easton Commons Way, Suite 125, Columbus, Ohio.

9.     ManorCare Health Services, LLC, is a Delaware Limited Liability Company owned and operated entirely by Defendant HCR ManorCare, Inc.  It too maintains its corporate headquarters at 333 North Summit Street, Toledo, Ohio, and may be served with process through its Registered Agent, CT Corporation Systems, 400 Easton Commons Way, Suite 125, Columbus, Ohio.

10.    While HCR ManorCare, Inc. ultimately controlled the corporate decisions which caused all of the activities and claims described below, it sometimes executed those corporate policies and practices through one of the remaining Defendants.

### III.  The FCA Statute

11.    The False Claims Act, as amended in substantial part in 1986, provides

5

in pertinent part that:

> (A) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (*or*) (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

> \* \* \*

> is liable to the United States Government for a civil penalty of not less than [$5,500 and not more than $11,000], plus 3 times the amount of damages which the Government sustains because of the act of that person.

12.     The False Claims Act, as further amended in 2010, provides in pertinent part that:

> (1) Any person who (A) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

> \* \* \*

6

> is liable to the United States Government for a civil
> penalty of not less than [$5,500 and not more than
> $11,000], plus 3 times the amount of damages which the
> Government sustains because of the act of that person.
> 31 U.S.C. § 3729(a)

13.    Each time the term "knowing" (or "knowingly") is used in the FCA,

and in this First Amended Complaint, it means that a person, with respect to

information (i) has actual knowledge of the information; (ii) acts in deliberate

ignorance of the truth or falsity of the information; or (iii) acts in reckless

disregard of the truth or falsity of the information; and (B) require no proof of

specific intent to defraud.  31 U.S.C. § 3729(b)(1).

## IV. Medicare, Medicaid, and Hospice Coverage

14.    The United States, through the Department of Health and Human

Services ("HHS") and its component agency, the Centers for Medicare and

Medicaid Services ("CMS"), administers the Medicare Part A and Medicare Part B

programs.  Generally, hospitals are reimbursed through the Medicare Part A

program, and physicians are reimbursed through the Medicare Part B program.

The United States also pays for health care services through numerous other health

care programs, including Medicaid and CHAMPUS.  Hospice services for

Medicare patients are reimbursed through Medicare Part A. Substantially over

85% of hospice patients in the United States have their hospice services paid for

7

by Medicare Part A.

15.   Hospice providers who participate in the Medicare program, as well as other federal health care programs, are required to enter into contracts or "Enrollment Applications" with HHS, and to sign and submit a further such Application after every five-year period of eligibility. Under the terms of these provider agreements, hospice providers certify that they understand and will comply with all laws, regulations, and guidance concerning proper practices for Medicare providers.  Because compliance with those certifications is a condition for participation in, and for any receipt of payments from, the Medicare program, hospice  providers implicitly use such pending certifications each time they submit a claim for payment to Medicare.

16.   Medicaid insurance systems, administered through each State's government but funded substantially by the United States through CMS, routinely incorporate and adopt Medicare payment requirements and related rules as the applicable State-sanctioned prerequisites for payments of claims to Medicaid for hospice services to Medicaid-eligible patients.

17.   A "hospice" is a public agency or private organization that is primarily engaged in providing care to terminally ill individuals, meets the conditions of participation for hospices, and has a valid Medicare (or Medicaid)

8

provider agreement.  Hospice care is an approach to caring for terminally ill individuals that stresses palliative care (relief of pain and uncomfortable symptoms), as opposed to curative care.

18.　Lawfully-administered hospice programs should be designed to provide pain relief to dying patients, and to keep such patients in their homes and with family members and other caretakers for as long as possible, as well as to provide comfort and support to such family members and caretakers.

19.　In order to be eligible to elect hospice care under Medicare, an individual must be entitled to Medicare Part A and be certified as being "terminally ill." 42 C.F.R. § 418.20.　To be considered "terminally ill" for purposes of qualifying for hospice services reimbursed by Medicare (or Medicaid), a physician must certify that the individual's prognosis is for *a life expectancy of six months or less* if the terminal illness runs its normal clinical course.  See, e.g, 42 C.F.R. § 418.22.  CMS guidelines require that for a patient to remain properly regarded as suffering from a terminal illness, the patient's condition must remain "deteriorating, debilitating, and progressing."  The existence in the patient's file of a medically valid certificate by a physician of that patient's terminal illness, based on the physician's own clinical judgment, is a statutory prerequisite to any hospice provider's entitlement to be paid each month

9

for any such service. 42 U.S.C. § 1395f(a)(7)("Conditions of and limitations on payment for services").

20.     When submitting each claim to Medicare Part A or Medicaid for any hospice reimbursement (through a claim form known as CMS UB-04), hospice providers explicitly represent that "(s)ubmission of this claim constitutes certification that . . . the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."  Each such claim also includes, as a further part of Claim Form CMS UB-04, a further certification that a "(p)hysician's certification and re-certification, if required by contract or Federal regulations, are on file." A legal prerequisite to the validity or accuracy of any such "certification" of initial hospice eligibility, and thus to the accuracy of the explicit certification contained on each claim form to Medicare or Medicaid, is the legal requirement that the relevant hospice medical director "must consider at least the following information: (1) Diagnosis of the terminal condition of the patient; (2) Other health conditions, whether related or unrelated to the terminal condition; (and) (3) Current clinically relevant information supporting all diagnoses."  42 C.F.R. § 418.25. The truth of each such express certification on each such claim form is presumed by Medicare and Medicaid payment officials as a material prerequisite to the hospice claimant's entitlement to be paid on any such claim. If

that certification is not true as to any claim for payment, the claim is factually and legally false.

## V.  Heartland's Management and Marketing Strategy

21.     Through the very aggressive and top-down patient recruitment, patient retention, and related organizational tactics described below, Heartland became, and remains today, one of the three highest-grossing recipients of Medicare Part A funds among all hospice providers in the United States.

22.     Heartland did not achieve or retain that status as a top-three recipient of Medicare Part A funds among all hospice providers by more effectively delivering  pain-relief medications or other palliative care to dying patients, or by providing more effective consolation to family members of dying patients.

23.     Nor did Heartland achieve its top-three national standing among all hospice providers by allowing, or deferring to, neutral and autonomous medical judgments by physicians in deciding which patients were no longer in medical need of curative medical treatments but needed only palliative hospice care.

24.     Heartland instead achieved its lucrative national financial status by imposing and enforcing from its Toledo corporate headquarters, beginning no later than 2004 and continuing to the time of the filing of this First Amended Complaint, a regimented national system of (a) financial bonuses designed to

distort clinical data and decision-making about whether patients were in fact

terminally ill and thus properly eligible for hospice care, and of (b) systematic

disregard for the professional independence and clinical autonomy of physicians

and other licensed health care professionals who urged that ineligible patients be

discharged from (or not admitted to) further hospice services (so that, in many

cases, such patients could receive needed curative care).

  25.  Dr. Holloway, the Relator in this case, was employed by Defendant

HCR ManorCare, Inc., in what was called its "Heartland Hospice Division," as a

Regional Hospice Consultant between early November of 2009 and early October

of 2010.  Her full-time job in that capacity was to apply Medicare rules governing

any hospice's entitlement to be paid for hospice services to the clinical

documentation and related documents then maintained for hundreds of patients

whose files she was asked to review.  The files and information reviewed by her

included the insurance history applying to each such patient, such as the status of

each such patient as a Medicare-eligible or Medicaid-eligible patient.  Some, but

not all, of the patient files she was asked to review at various Heartland locations

had earlier been assigned to a category of "Bill Hold Chart Audits," which meant

that claims to Medicare for payment were being held pending Dr. Holloway's

review.

26.    Relator Holloway learned much of the information recounted in this First Amended Complaint from her own reviews of the details of those hundreds of clinical records of incumbent hospice patients of Heartland-operated agencies, and her own direct experience with those agencies' daily operations and management throughout Missouri, Illinois, Arizona, New Mexico, Oklahoma and Texas.   All of the allegations asserted in this First Amended Complaint are based entirely on Dr. Holloway's direct observations during her employment with Heartland, and on more recent communications with her former colleagues at Heartland.  She is aware of no public disclosures of such information which preceded her filing of this case.

27.    Dr. Holloway also gained personal knowledge of the corporate-wide conduct described herein through her direct participation in weekly telephone conference calls also participated in by Heartland nationwide Vice President (and "General Manager") Mike Reed, Western States Director of Clinical Services Marsha Lambert, Western States General Manager Paula Adams, Area Vice President for Clinical Services Annette Orlowski, and Heartland's National "Education" Director M. J. Ruppert.  Holloway also learned further such information through her own participation in meetings with Heartland National "Sales Director" Wendy Hoy.

28.     Each of the weekly telephone conference calls participated in personally by Relator Holloway with principal Heartland corporate executives was preceded by the emailing by Dr. Holloway (and Heartland's other Regional Hospice Consultants) of a "Workbook" document, detailing the clinical records and billing histories of incumbent hospice patients determined by Dr. Holloway and her regional counterparts not to then be suffering from any terminal illness, with a recommendation that each such patient be discharged from further hospice treatments.

29.     Relator Holloway also learned from her personal reviews of the files of hundreds of such incumbent Heartland hospice patients that the overwhelming majority of such patients were elderly, and were insured by Medicare (Part A) and/or Medicaid, and that all such patients were the subject of monthly claims, made by Heartland's corporate headquarters in Toledo, for "per diem" payments predominantly by the Medicare or Medicaid insurance systems.   From Dr. Holloway's many years of experience working in and with hospice providers, she knows that about 90% of all hospice patients in the United States are the subject of monthly claims by hospice providers to Medicare and/or Medicaid, given the population typically served by hospices.   She also knew from her work with Heartland that it became one of the three highest recipients of federal health care

14

revenue, among all hospice operations in the United States, predominantly through claims Heartland had made to Medicare Part A for payments.

30.    The central preoccupation of senior Heartland executives, throughout Dr. Holloway's weekly direct communications with them, was Heartland's corporate-wide obsession with increasing, as the central corporate "end in itself," the "census roster" of federal-revenue-generating patients at each of Heartland's hospice agencies nationwide.  That has remained the central corporate strategy of Heartland with respect to its hospice operations during the years since Dr. Holloway decided to leave Heartland.

## VI. Heartland's Bonus Payments to Patient Recruiters, Admission Nurses, Agency Administrators and Regional Administrators

31.    Heartland offered to and did pay, to the members of the Heartland "sales team" working to recruit new hospice patients at each of Heartland's local hospice agencies, a quarterly bonus equal to an additional thirty-percent (30%) of their salary if, but only if, the new hospice patient enrollments ("starts of care," or "SOC") caused by or attributed to their recruitment efforts, met a monthly or quarterly "budget" for such new patients at each such local agency.  Periodic "budgets" (or "targets") for admitting and retaining hospice patients were imposed on each local hospice agency by Heartland's Toledo headquarters, which selected

15

such "budgets" based on Heartland management's corporate-wide targets for revenue growth from Medicare payments, rather than on clinically-based information about patient needs within any such market.  As part of its patient "recruitment" practices, Heartland specifically authorized such bonus-driven "sales team" members to get prospective hospice patients to sign forms giving their "consent" to hospice treatments (and "electing" hospice treatment over curative health care) before any of Heartland's Medical Directors had received any information about such patients.

32.    Heartland also offered and paid to all "Agency Administrators" (or "General Mangers") in charge of each such hospice agency a quarterly bonus, also equal to thirty-percent of their salaries, if (but only if) their respective agency met its headquarters-assigned "budgets" for (a) new "starts of care" for hospice patients, (b) patient "census" totals (resulting both from the recruitment of new hospice patients and the non-discharge of incumbent hospice patients), and (c) total revenue received from the agency's billings to Medicare and Medicaid for hospice services. Each of Heartland's Regional Directors of Operations was also paid such revenue-based fractional bonuses.

33.    Prior to 2010, Heartland also offered and paid such lucrative bonuses (of thirty-percent of their principal salaries) to the registered nurses serving in

each hospice agency as "Patient Care Coordinators."  Such Patient Care

Coordinators were in charge of all activities by nurses within their respective

hospice agencies, including the preparation of clinical records of the medical

conditions and progress of patients in reliance on which physicians serving as

Medical Directors of Heartland's local hospice agencies decided whether or not to

certify patients as eligible for hospice services (and also whether or not incumbent

hospice patients should be discharged as no longer suffering from a terminal

illness).

     34.    Heartland's corporate-wide practice of offering bonuses to Agency

Administrators and Patient Care Coordinators, based on their presumed abilities to

cause increases in their agency's hospice patient census, was intended by

Heartland's senior management to incentivize such clinical decision-makers to

distort clinical records in favor of admitting new (and retaining existing) hospice

patients who in medical fact were not terminally ill, and who in truth may have

been in medical need of curative care (to which they were not entitled as long as

Heartland caused them to go into or stay in palliative-only hospice services).

     35.    In addition to substantial financial rewards for adding new hospice

patients as a corporate "end in itself," Heartland's Toledo headquarters executives

also promised and dispensed paid vacation hours to the clinical and non-clinical

17

staffs of "the Hospice agency that increases(s) their census the most" within each Heartland region.

36.    Toledo-based Heartland executives also regularly threaten to terminate "sales team" members, and even clinical staff members, if the "census" requirements assigned to them were or are not met.

37.    Heartland's Toledo corporate headquarters has controlled all decisions regarding the adoption, alteration, and enforcement of Heartland's census-driven bonus incentives to local hospice agency administrators. As one example of that corporate control from Toledo, Heartland national Vice President (and "General Manager") Mike Reed announced by email on September 22, 2010, to all of Heartland's "Regional Directors of Operations" and "Senior Leadership Team" nationwide, a change in Heartland's corporate-wide "2010 bonus programs" under which no employee's receipt of a "quarterly bonus" would be reduced or affected just because the local agency to which the employee was assigned had "failed" an audit review designed to identify "reimbursement/compliance risk" and to assess the propriety of the agency's "documentation" of the medical justification of hospice admissions. In other words, Heartland's Reed decided that a local agency's demonstrated failure to obey Medicare reimbursement and medical documentation "compliance"

18

requirements should not hinder agency employees from being rewarded financially

for doing what it took to increase the number of hospice patients on Heartland's

census rolls (and thus to increase the volume of claims to Medicare and Medicaid).

Mr. Reed affirmed to Heartland's entire regional leadership that Heartland did not

want any "underlying worry of individual financial penalty" (from audit

discoveries of legal compliance violations) to slow down or influence the patient

recruitment and retention activities with which Heartland obviously intended its

recruitment, clinical, and administrative staff to remain preoccupied.

38.     Attached as Exhibit A hereto is a representative "Monthly Agency

Operations Review - HOSPICE," typical of what Toledo-based Heartland

principal executives used, through their monthly telephone conference calls with

Agency and Regional Heartland Administrators, to badger and discipline such

bonus-paid managers to get and keep sufficient patients enrolled in hospice

services to meet the patient census and financial "budgets" for obtaining Medicare

funds, imposed by Heartland's Toledo headquarters on each such operation.

39.     In deciding intentionally to incentivize agency and regional

administrators, "sales" personnel, and clinical personnel to distort the medical

facts regarding the eligibility of patients for hospice care, and in causing

physicians serving as Medical Directors to rely on resulting distorted records in

certifying that eligibility, Heartland through its corporate headquarters and its most senior corporate leadership acted with reckless disregard (a) for the truth of patients' actual medical conditions and needs, (b) for the clinical accuracy of the resulting clinical records as to each such patients, and (c) for the medical necessity of resulting claims to Medicare and Medicaid for resulting hospice services.

40.    The reckless disregard of Heartland's corporate marketing strategy has thereby caused the creation of purportedly "clinical" documents which themselves manifest  reckless disregard for the overall clinical conditions of patients, but on which physicians have relied in certifying each patient's hospice eligibility.  Heartland's policy and practice is for physicians indeed to rely on clinical notes and findings prepared by Heartland's non-physician staff as their basis for deciding whether or not to certify or re-certify the eligibility of patients for Medicare payments for hospice services.

41.    Though each resulting claim by Heartland for payment by Medicare includes as a part of the claim an express representation by Heartland that the "submission of this claim constitutes certification that . . . the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts" (material, that is, to the provider's entitlement to be paid on each such claim), all such express certifications by Heartland, and thus all claims of which such express

certifications were a part, were factually and legally false when made, as Heartland in the course of making such claims concealed the material facts that the clinical notes and findings on the basis of which physicians had certified patients' eligibility were systematically unreliable due to the aggressive marketing and training practices imposed on clinical and non-clinical staff by Heartland's corporate-wide policies.

42.  Each of Heartland's claims to Medicare for payments has also included, as a further part of Claim Form CMS UB-04, a further certification that a "(p)hysician's certification and re-certification, if required by contract or Federal regulations, are on file." A legal prerequisite to the validity or accuracy of any such physician "certification" of initial hospice eligibility, and thus to the accuracy of each such explicit certification made on each such claim, is the legal requirement that the relevant hospice medical director "must consider at least the following information: (1) Diagnosis of the terminal condition of the patient; (2) Other health conditions, whether related or unrelated to the terminal condition; (and) (3) Current clinically relevant information supporting all diagnoses." 42 C.F.R. § 418.25.  The truth of each such express certification on each such claim form is presumed by Medicare and Medicaid payment officials as a material prerequisite to the hospice claimant's entitlement to be paid on any such claim. If

21

that certification is not true as to any claim for payment, the claim is factually and legally false. Because Heartland's corporate-wide marketing and training practices systematically rendered the non-physician notes and findings on which physicians relied on making such certifications of eligibility factually unreliable as to "other health conditions" and "all diagnoses" of such patients, the prerequisites for valid physician certificates made in reliance thereon were systematically not met, such that valid physician certifications were in fact not "on file" as certified to by Heartland as a part of each resulting claim to Medicare for federal funds.

## VII. Heartland's "Document Only to Decline" Medical Records Practices

43.     Heartland has trained its hospice agency nurses and other clinical personnel charged with preparing the documentation of the clinical status of patients being considered for hospice admissions (or who might be considered for discharges from hospice services) to focus their documentation, not on truthful clinical evidence of a patient's stability or need for curative treatment, but instead on purported clinical indicia of medical decline. Such personnel were specifically trained not to record in clinical records, for the purpose of determining the initial eligibility of patients for hospice services, references to "improving," "stable," or "no change." In its training of clinical personnel, Heartland specifically referred to

22

the use of such phrases in Heartland clinical records, however truthful such descriptions may be of a patient's actual condition, as "Ship Sinkers." Heartland's preferred corporate-wide practice was referred to as "negative charting," as it was intentionally designed to distort medical records in favor of an initial determination of hospice eligibility (or "converting" referrals into "starts of care"). Heartland's "negative charting" practice was routinely enforced by directives from corporate, regional, and local administrators.

44.     As one representative example of such corporate-wide practices, Heartland issued to all of its hospice agencies nationwide a "Heartland Best Practice" Guide, authored by Heartland Education Director M. J. Ruppert and dated July 29, 2009, designed for "Documenting to Support Hospice Eligibility," instructing clinicians on specific phrases they should write down to "document" that particular patients no longer needed curative care but only needed pain-reducing palliative care and thus hospice services.

45.     Heartland in its "Heartland Best Practice Guide" also urged clinicians to use specified phrases in order "to support hospice eligibility" including the phrases "new skin tears," "unable to carry on a conversation without shortness of breath," "new episodes of chest pain," and "eating only sweets, snacks - refusing meals."

23

46.     Summing up its training directives, Heartland training materials urged its clinicians to "obtain all information about the condition that supports the terminal diagnosis and prognosis."

47.     Heartland in its training also offered this emphatic "Reminder" to its clinical staff: "(I)f the reviewers cannot see the patient's decline in our documentation they can deny payment."

48.     Heartland's "Best Practice(s)" intentionally failed to include or encourage any documentation of clinical stability or improvement on the part of any patient.

49.     Through its corporate-wide training and its Toledo-based and Regional "Director(s) of Clinical Services," Heartland has indeed systematically and explicitly discouraged clinicians from adding notations to patients' clinical records to the effect that patients' were improving or stable in their conditions, or were without ongoing pain, even when such clinical notations would be necessary in order to record the objective truth about patients' conditions as they pertain to hospice eligibility.

50.     In systematically and intentionally causing resulting distortions of the complete medical conditions of prospective and actual hospice patients on the medical records on which local Heartland Medical Directors relied in "certifying"

24

patients' terminal illness conditions, Heartland's highest corporate management

exercised, and caused local non-physician hospice staff members to exercise,

reckless disregard and deliberate ignorance as to the true medical conditions and

prognoses of patients, such that distorted and reckless medical records and

resulting reimbursement claims were "knowingly" caused by Heartland (within the

meaning of the FCA's definition of "knowingly" at 31 U.S.C. § 3729(b)(1)).

51.     In claiming an entitlement to be paid by Medicare and Medicaid for

resulting reimbursement claims, Heartland did not and could not reasonably rely

on or affirm the accuracy of physician certifications made in reliance on its non-

physician staff's clinical records, since Heartland knew that its marketing, training

and clinical practices had substantially corrupted the reliability of such records as

a credible and neutral basis for making such physician certifications.

52.     As Heartland executives also knew, Heartland decided not to require

its physician Medical Directors personally to examine any patient prior to any

initial certification of their status as suffering from a terminal illness and thus as

eligible for hospice services.  Heartland also decided not to require its Medical

Directors personally to review underlying clinical records before accepting non-

physician employees' conclusions that patients were terminally ill.

53.     Each time Heartland through its Toledo headquarters billing staff

submitted electronic payment claims to Medicare or Medicaid payment

intermediaries, and thereby affirmed Heartland's entitlement to be paid as to each

such claim, and yet retained purported clinical documents for relevant patients

which systematically did not in fact meet the material prerequisites required by 42

U.S.C. § 418.25 for diagnosing and making medical judgments about "other health

conditions" and "clinically relevant information supporting all diagnoses,"

Heartland made and used implicit and explicit false assertions and false

certifications in order to get payment on each such false claim, in violation of 31

U.S.C. § 3729(a)(2)(as amended in 1986) and knowingly used (and caused to be

made and used) false records material to the resulting false claim, in violation of

31 U.S.C. § 3729(a)(1)(B)(as amended in 2010).

## VIII. Heartland's Corporate-Wide and Systematic Violations of State Medical Licensing Statutes

54.     Heartland's Toledo-based corporate management regularly pushed

Agency Administrators to "convert" patient "referrals" solicited by bonus-paid

"sales team" members into "starts of care" ("SOC," or billable hospice patients) as

quickly and with as little deliberation and analysis as possible.  As Exhibit A

reflects, Heartland executives tracked the "conversion %" of each hospice agency

26

each month, from "referrals" to "SOC" enrollment and payment claims.  Heartland

management reports even tracked the "SOC Conversion time %" to judge the rate

at which each agency "converted" sales referrals to Medicare-billable hospice

enrollees *on the "same day" of the sales referral* (or whether the agencies failed to

"convert" on the "same day," but instead converted patients during two-day or

longer periods).

55.    Heartland's Toledo-based corporate management intentionally

adopted and enforced the opposite kind of process for allowing hospice patients

who had not died to be discharged from billable hospice enrollments. The

Heartland process for allowing such "live discharges" was intentionally designed

and enforced by Heartland executives to be slow, bureaucratic, multi-layered, and

resistant to the medical judgments of Heartland's own Medical Directors.

56.    In order to chill and deter "live discharges" and thereby to keep

hospice patients enrolled and billable for as long as possible, and in reckless

disregard for the needs of such patients for curative medical treatment for which

funding was not available to them during their hospice enrollment, Heartland

adopted a corporate-wide practice of authorizing local hospice agency "Director(s)

of Clinical Services" to veto or override any recommendation (or "decision") by

any Medical Director (or any other physician) to the effect that any hospice patient

was no longer in medical need of hospice services and should be discharged through a "live discharge."  Local Agency Directors of Clinical Services were typically registered nurses, and not physicians.

57.     Heartland likewise adopted a practice of authorizing *regional* and Toledo-based *corporate-wide* administrators to veto, override, or ignore recommendations by physician Medical Directors that patients were no longer eligible for hospice treatment and should be discharged as "live patients" (so that, in many cases, they could become eligible for needed curative medical treatments).

58.     Many Heartland agency and regional administrators had been promoted into their jobs because of their marketing or administrative success. Though some were Registered Nurses, none are believed to have been licensed as physicians.

59.     In deciding to override or reject medical judgments by physicians engaged as Medical Directors by Heartland, Directors of Clinical Services and regional and corporate administrators either (a) intentionally and recklessly disregarded all medical necessity considerations or (b) conducted their own "diagnoses" of the hospice patients' medical conditions and prognoses.

60.     Any affirmative decision by any Heartland personnel about whether or not to discharge any patient from hospice care required the decision-maker to

"diagnose" the patient's medical condition as it pertained to whether or not the

patient's illness was likely terminal within the required six-month period.  No such

decision can be rationally, legally, or responsibly made without arriving at a

medical diagnosis.

61.     Medicare and Medicaid systems indeed required (and require), as a

material prerequisite to any hospice provider's right to be paid for any hospice

service, that a physician render a medical "diagnosis" of the patient's condition

and prognosis with respect to the period for which any payment is sought. 42

U.S.C. § 1814(a)(7), and 42 C.F.R. § 418.25(b).  Each such diagnosis (and each

resulting physician certification of medical necessity) must by statute be "based on

the physician's or medical director's clinical judgment regarding the normal

course of the individual's illness." *Ibid.*

62.     Indeed, no hospice admission is legally valid, and no claim resulting

from any such admission is payable as a matter of law, unless a hospice medical

director and the patient's attending physician, "in reaching a decision to certify

that the patient is terminally ill," has considered not only a "*diagnosis* of the

terminal condition of the patient" but also "current clinically relevant information

supporting *all diagnoses.*" 42 C.F.R. § 418.25(b)(emphasis added).

63.     "Diagnosis" is a legal term-of-art in each state in which Heartland

29

conducted and conducts its hospice operations, as each such state requires as a part of its medical licensing statutes that no person may lawfully conduct a "diagnosis" of the medical condition of a person unless that person has obtained within that state a license to practice medicine (or, in some states, a license to practice as a nurse practitioner).

64.    In Ohio, for example, in which Heartland's Toledo-based corporate administrators conducted their decision-making about whether or not hospice patients could be discharged, Ohio Revised Code Section 4731.34 provided (and provides) that "(a) person shall be regarded as practicing medicine" who "does any of the following" activities, including "(e)xamines or diagnoses for compensation of any kind," or "advises (or) recommends . . . for compensation of any kind (any) treatment, of whatever nature, for the . . . relief of (any) bodily injury, infirmity, or disease."  No such person in Ohio may conduct any such activities within the law without having a medical license in Ohio.

65.    Adherence and obedience to state medical licensing laws in the course of certifying and otherwise representing the terminal illness of each hospice patient each month was a material requirement of and prerequisite to the lawfulness of any such assertion of any entitlement to be paid on any resulting claim for hospice treatment.  Performance of any service - including a "diagnosis"

30

of the terminal (or non-terminal) condition of a patient - "must be authorized, delivered, and supervised only by health care professionals who meet the appropriate qualifications," including State licensing. 42 C.F.R. § 418.62 ("condition of participation: Licensed professional services").

66. In systematically authorizing non-physician administrators to reject or veto diagnostic judgments made by licensed physicians serving as Heartland Medical Directors, and thus to impose their own financially-driven decision (or "diagnosis") about the medical needs of particular patients, Heartland acted in reckless disregard and deliberate ignorance of state licensing laws, patients' medical conditions, and the actual medical necessity of continuing hospice services.

67. A physician's certification of the medical fact of a patient's terminal illness (and any physician's re-certification of a patient's continuing medical need for hospice services), and the clinical accuracy thereof, are material prerequisites to any hospice provider's entitlement to be paid by Medicare or Medicaid for any such hospice service. 42 U.S.C. § 1395f(a)(7). Any submission of any claim for payment is accompanied by an express certification that such a written physician diagnosis and certification are on file pertaining to the date of service for which the claim is made. As to Medicare in particular, any "payment . . . may be made to

providers . . . only if" properly-documented physician certifications were on file

and applied to the days for which "per diem" payments are sought by any hospice

provider. *Ibid.*

68.    All claims by Heartland for all hospice patients recommended for any

"live discharge" from hospice services, or for periods as to which no licensed

physician had executed a re-certification of an ongoing terminal illness, made or

presented to payment intermediaries acting for and funded by Medicare Part A or

Medicaid systems for any hospice services delivered after any such

recommendation was communicated to any Heartland administrator, were legally

and factually false claims within the meaning of the FCA.

### IX. Heartland's False Claims for Reimbursement Made After Heartland Administrators Received Findings from Heartland's Regional Hospice Consultants of No Legally Adequate Medical Documentation of Terminal Illness

69.    Regional Hospice Consultants ("RHCs"), including Dr. Kathi

Holloway, the Relator in this case, were engaged by Heartland in part, and

purportedly, to review hospice records for samples of incumbent hospice patients

and to make recommendations about whether or not such records met Medicare

payment prerequisites (based on Medicare guidelines for Local Coverage

Determinations) in documenting the medical propriety of past and continuing

hospice treatment and billings as to the relevant patients.  The central purpose of

the work of RHCs, including Dr. Holloway, was to apply Medicare claims

payment requirements to records pertaining to Medicare-eligible hospice patients.

70.    Like other RHCs engaged by Heartland, Relator Holloway discovered

many incumbent patients contributing to Heartland's census of hospice patients as

to whom documentation failed to demonstrate a reasonable and medically

necessary reason for continuing hospice care and services.  Also like other

Heartland RHCs, Dr. Holloway communicated to senior Heartland administrator

the names of numerous incumbent hospice patients who were no longer

documented to be in medical need of hospice services.

71.    Heartland's RHCs prepared and emailed each week to

Heartland corporate executives, including Heartland Vice President (and General

Manager) Mike Reed and Heartland Vice President Annette Orlowski, an RHC

"workbook" detailing each RHC's findings, from their weekly on-site visits to

local hospice agencies of Heartland, recording the inadequacies of medical

documentation for hospice eligibility as to patients whose documentation each

RHC had reviewed.   One of the "workbook" categories was to identify the names

of incumbent hospice patients found "not eligible per documentation." The RHCs'

particularized reasons why each such hospice patient was not eligible for hospice

services was explained each week to such Heartland executives in weekly telephone conferences with senior Heartland personnel.  Heartland's regional and local clinical and operations administrators also received by email the same "workbooks."

72.    Relator Holloway routinely followed up during her own subsequent visits to local Heartland hospice agencies to determine whether, after her "workbooks" and related discussions with Heartland administrators had identified patients who had no documented terminal illness, those patients had been discharged by Heartland administrators.  Routinely, they had not been discharged, but remained on hospice and continued to be the subject of claims to the Medicare Part A and Medicaid systems.

73.    As to one patient who Dr. Holloway determined had been held on Heartland's hospice census lists for over five years, and for whom the relevant documentation revealed no reasonable medical necessity for hospice services, Dr. Holloway emailed Heartland's corporate-wide Director of Clinical Services Marsha Lambert about the legal necessity of discharging the patient.  Lambert instructed Holloway to look only at medical records pertaining to the most recent sixty-day period to see if continuing hospice treatment could be justified. The patient was not discharged.

74.    Heartland's affirmative decisions to continue billing Medicare Part A and Medicaid for patients recommended for discharge by Heartland's RHCs were made with reckless disregard and deliberate ignorance for the medical justification for hospice treatment.

75.    As a result of and in the course of that reckless disregard and deliberate ignorance, Heartland knowingly caused thousands of legally and factually false claims to be presented to Medicare Part A and to Medicaid systems.

## X. Heartland's Patterns of "Reverse False Claims"

76.    On the occasions when Heartland administrators and corporate managers did eventually decide to allow "live discharges" of hospice patients earlier determined by health care professionals not to have a terminal illness, it was Heartland policy (a) not to authorize or allow medical reviews of the discharged patients' records from months earlier than the final month of Heartland hospice treatments, and thus (b) not to determine how many per diem payments should be returned or refunded to Medicare Part A or Medicaid systems as to earlier months of service during which the discharged patients were also not eligible for such hospice services.

77.    As one example of that Heartland practice, Relator Holloway asked Heartland's corporate-wide Director of Clinical Services Marsha Lambert, on May

18, 2010, about Heartland's policy "on going back through each benefit period" as to a patient who had been on Heartland's hospice rolls at its Shawnee, Oklahoma agency for over five years, costing Medicare approximately $500,000.00.  As Lambert then knew, Dr. Holloway had determined from the patient's clinical records that such documentation then demonstrated no evidence of reasonable medical necessity for continuing hospice services. In response, Lambert instructed Holloway by email not to "go back through the benefit periods" to determine when the patient was not eligible for hospice services, so as to avoid refunds to Medicare for prior months.

78.    As further examples of Heartland's corporate-wide practice of intentionally avoiding legally-required refunds to Medicare and Medicaid, Dr. Holloway advised Heartland Clinical Director Annette Orlowski that particular hospice patients being served out of Heartland's Fort Worth, Texas agency were not documented as suffering from any terminal illness, including a patient who had been on hospice for 1,346 days for "dementia," a further patient who had also been on hospice for 753 days for "dementia," another patient who had been on hospice for 496 days for "dementia," and a patient who had been on hospice for 1,248 days for "chronic obstructive pulmonary disease."   Relator Holloway recommended to Heartland Clinical Director Orlowski that all payments received

36

by Heartland as to all periods of the hospice services to those patients should be returned to Medicare.  Orlowski responded that Heartland Vice President Mike Reed had told Orlowski personally to review the patient files for those patients. No refunds were made by Heartland to Medicare or Medicaid as to any of those patients.

79.     Heartland's practice in responding to Medicare intermediary auditors' periodic administrative requests for additional documentation ("ADRs"), of the hospice eligibility of patients selected for review by the auditors, was to refuse to respond to such requests as to patients Heartland knew (or realized upon inquiry) were not eligible for hospice services.  Heartland adopted this practice of concealment from federal contractors after learning from its experience with Medicare ADRs that such a refusal to present documentation would result in intermediaries' denial of only one monthly claim (and the finding only of an "untimely response"), whereas responding to the ADRs with documentation as to such patients would expose to the auditors the same patients' ineligibility for additional months (and in some cases years), and would expose Heartland to liability for refunds to Medicare for those additional months (and a much higher risk of a more rigorous "program integrity" audit focused on evidence of actual fraud).  Heartland would thereby intentionally conceal from Medicare's fiscal

intermediaries the same patients' longer patterns and periods of ineligibility by deciding not to respond at all to such ADR requests for documentation as to such patients. Moreover, Heartland's practice as to such patients was to resume claims as to future months for the same patients, who would remain on hospice rolls.

80.    Dr. Holloway knew of this Heartland practice as to ADR requests because she was asked to assist in researching medical records with which to consider responding to ADR requests, and was instructed by Heartland Area Vice President for Clinical Services Annette Orlowski to follow the practice described above in the course of assisting with an ADR request in Arizona in 2010.  Dr. Holloway also personally observed Ms. Orlowski instruct a Heartland Medical Director at Heartland's Ft. Worth, Texas hospice agency to alter the clinical records of a patient who was the subject of an ADR request, so as to assert that the patient's "cancer" condition constituted "Stage IV cancer," though there was no medical evidence that that was true.

81.    Many of the hundreds of patients whose clinical documentation was personally reviewed by Relator Holloway had been retained in hospice by Heartland for substantially more than one year.

82.    Each of the patients identified in Exhibit "A" to the original Complaint herein was among the Medicare-insured Heartland patients whose

38

clinical documentation and billing histories were personally reviewed and

analyzed by Relator Holloway, and determined by her not to be eligible for

ongoing hospice service payments under the Medicare payment eligibility

guidelines and laws Holloway had specifically been hired to apply to records

concerning each such patient.  In applying those Medicare payment guidelines to

each such Medicare beneficiary, Dr. Holloway found that all such patients were

not documented to be suffering from any terminal illness.  Despite being informed

of that evidence,  Heartland administrators (and headquarters executives, including

General Manager Mike Reed) decided not to discharge such patients and to

continue billing Medicare for their continuing hospice treatment. Heartland had

begun submitting monthly claims to Medicare for each such patient beginning in

the month of the "start of care date" specified for each patient on Exhibit B.

Heartland continued to submit such claims for payment by Medicare even after

receiving notice of the above findings by Dr. Holloway. All such payment claims

as to all such patients, before and after such notice, were knowingly false.

("Exhibit A" to the original Complaint herein, having been appropriately sealed by

the Clerk of Court in deference to patient privacy concerns, shall for reasons of the

same concerns not be attached to the public filing of this First Amended

Complaint.   That original "Exhibit A" shall remain under seal and shall be

incorporated herein by reference, and regarded as "Exhibit B" to this First Amended Complaint.)

83.    In early 2009, Heartland managers learned that in January of that year the United States Department of Justice had announced that it had entered into a settlement with SouthernCare Hospice pursuant to which SouthernCare paid $24,700,000 to settle allegations that it had submitted hundreds of false claims to Medicare seeking reimbursement for patients treated at its hospice facilities who did not suffer from any documented terminal illness and thus did not qualify for Medicare's hospice benefit.  In response, Heartland discharged numerous hospice patients who it likewise had known did not suffer from any terminal illness. But pursuant to Heartland's corporate policy of avoiding its refund obligations as to months preceding patients' "live discharges," Heartland knowingly and fraudulently decided not to refund to Medicare or Medicaid funds earlier received for the same discharged patients during earlier periods for which the same patients were also known not to be eligible.

84.    While Relator Holloway was reviewing Heartland medical documents in Heartland's Dallas, Texas hospice agency in 2009, Heartland Administrator Charlene Wobig told Holloway that a large stack of files for patients who were to be discharged was generated "after Southern Care got in trouble."

85.     Through Heartland's conduct in knowingly and fraudulently concealing the clinical ineligibility of hospice patients during periods for which Heartland avoided and evaded refund obligations to the Medicare and Medicaid systems, Heartland has knowingly and improperly avoided and decreased its obligation to pay and transmit money and property to the Government, during all times leading up to the trial of this case, in violation of 31 U.S.C. § 3729(a)(1)(G). Prior to 2010, in falsely certifying with each claim to Medicare and Medicaid that "the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts" in the course of each such claim, and in otherwise explicitly making the false certifications described in Paragraphs 41 and 42 above, Heartland also knowingly made, used, and caused to be made and used, false records and false statements in order to conceal and avoid obligations to pay or transmit money to the United States, namely refunds of payments previously paid by Medicare and Medicaid as to the same ineligible patients, in violation of 31 U.S.C. § 3729(a)(7).

## XI.  Consequences of Heartland's Reckless Practices

86.     As a predictable result of Heartland's reckless practices as described above, many hundreds of Medicare and Medicaid patients were recklessly retained

41

by Heartland in hospice services for periods far beyond any "expected" six-month period of "life expectancy," such that for many local Heartland hospice agencies the *average* period for which patients throughout the agency had been retained *exceeded any such six month period*, including the following local agencies as of June of 2010, all of which Heartland corporate-wide managers were aware of from their receipt of monthly reports of such "Average LOS (length of stay)" data:

| *Heartland Agency Location:* | *AVERAGE Length of Hospice Stay among All Patients:* |
|---|---|
| Indianapolis | 264.93 |
| Dayton | 258.30 |
| Irwin | 243.47 |
| Kalamazoo | 243.41 |
| Washington | 240.90 |
| Ft Worth | 234.25 |
| Palatine | 229.18 |
| Flint | 228.39 |
| Pittsburg | 227.66 |
| Columbus | 227.07 |
| Rockford | 224.61 |
| Newark | 222.03 |
| St. Louis | 218.15 |
| Shawnee | 214.85 |
| Freemont | 214.36 |
| Grand Rapids | 213.66 |

42

| | |
|---|---|
| Philadelphia | 212.83 |
| Topeka | 210.64 |
| Toledo | 205.57 |
| West Covina | 202.50 |
| Ft. Wayne | 201.91 |
| Beltsville | 201.42 |
| Kansas City | 195.65 |
| Cleveland | 188.95 |
| Erie | 184.58 |
| Milford | 184.56 |
| San Antonio | 183.17 |

87.    As a result of the reckless corporate practices of the Defendants as alleged above, Heartland's Toledo headquarters billing staff submitted thousands of knowingly false claims to the United States.

88.    Over thirty percent (30%) of all claims for hospice payments made by Heartland since early 2004 have been legally and factually false, in respects material to Heartland's entitlement to payments, resulting in millions of dollars in payments by Medicare Part A and Medicaid intermediaries, all with funds of the United States.

89.    If the Medicare and Medicaid intermediaries who paid those claims had known at the times of those payments of the conduct by Heartland described above, the claims would not have been paid. Payment officials' presumptions of

the accuracy of Heartland's assertions of an entitlement to be paid, and of

Heartland's certifications and maintenance of the required underlying

documentation, were all material to the making of each such payment to

Heartland.

90.    Ultimately as a result of Heartland's conduct as described above,

the Defendants received millions of dollars from the United States to which the

Defendants were not lawfully entitled.

91.    All of Heartland's legally and factually false claims were submitted

electronically by Heartland's Toledo headquarters billing staff, on a CMS "UB-

04" electronic form, to contractual intermediaries of Medicare and Medicaid.

Heartland's Medicare Reimbursement Specialist Sharon Jacobs, working in the

same Toledo headquarters, was the Heartland principal in charge of presenting

such claims to Medicare and Medicaid.  Relator Holloway communicated at least

once each week with Ms. Jacobs concerning Medicare payment eligibility criteria

and her application of those criteria to particular patients, including her provision

to Ms. Jacobs each week of her "workbooks" as described in Paragraph 71 above.

As Dr. Holloway has learned during her almost three-decades of compliance-

related activities in the hospice industry, all payments by Medicare and Medicaid

were (and are) on a "per diem," per-patient basis. Claims for hospice services

delivered in the patients' homes use a billing code "Q5001," whereas claims for

hospice services provided in Heartland's (corporate-owned or contracted)

inpatient hospice facilities use a billing code of "Q5006."  Each such use of each

such billing code as a result of each hospice service by each Heartland agency

resulted in the same payment by Medicare to Heartland, as the amount of the

payments varied only by (a) the billing code itself and (b) the region of the country

in which the services were rendered.


## COUNT I

### Claim By and on Behalf of the United States under the False Claims Act
### (Presenting False Claims)

92.  Plaintiff realleges and incorporates by reference paragraphs 1 through

91 as though fully set forth herein.

93.  This is a claim under the False Claims Act,  31 U.S.C. §§ 3729-33, as

amended in 1986, 2009 and 2010.

94.  The Plaintiff/Relator, Kathi Holloway, has standing to maintain this

action by virtue of 31 U.S.C. §3730(b).

95.  By virtue of the acts described herein, Defendants knowingly presented,

and caused to be presented, to officers or employees of the United States

Government, false or fraudulent claims for payment and approval, within the meaning of 31 U.S.C. § 3729(a)(1) as amended in 1986.

96. By virtue of the same acts as described above, the Defendants knowingly presented, and caused to be presented, false or fraudulent claims for payment or approval, within the meaning of 31 U.S.C. § 3729(a)(1)(A) as amended in 2010.

97. By virtue of the false claims presented or caused to be presented by Defendants, the United States has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $21,563 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## COUNT II

### Claim By and on Behalf of the United States under the False Claims Act
### (Use of False Records or Statements)

98. Plaintiff realleges and incorporates by reference paragraphs 1 through 91 as though fully set forth herein.

99. This is a claim on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729-33, as amended.

100. The Plaintiff/Relator, Kathi Holloway, has standing to maintain this

action by virtue of 31 U.S.C. §3730(b).

101.  By virtue of the acts described above and Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the Government, Defendants knowingly made, used, and caused to be made and used, false records and statements to get false or fruaudlent claims paid or approved by the Government, in violation of 31 U.S.C. § 3729(a)(2) of the FCA, as amended in 1986.

102.  By virtue of the same acts described above and Defendants' use of, or activities causing to be used, false records and statements to get false and fraudulent claims paid and approved by the Government, Defendants knowingly made, used, and caused to be made and used, false records and statements material to false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2) of the FCA, as amended in 2010.

103.  By virtue of, and as a result of, the false records and statements used to get (or material to getting) false claims paid by the Government, the United States has suffered actual damages and is entitled to recover three times the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $21,563 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

47

## COUNT III

### Claim By and on Behalf of the United States under the False Claims Act (Wrongfully Retaining Government Funds)

104.  This is a claim under the False Claims Act,  31 U.S.C. §§ 3729-33, as amended.

105.  Plaintiff realleges and incorporates by reference paragraphs 1 through 91 as though fully set forth herein.

106.  By reason of the foregoing with respect to Defendants' reckless scheme, Defendants knowingly made, used, and caused to be made or used, false records and statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Government, in violation of 31 U.S.C. § 3729(a)(7), as amended in 1986.

107.  By reason of the foregoing with respect to Defendants' scheme, Heartland knowingly concealed, and knowingly and improperly avoided and decreased, obligations to pay and transmit money to the Government in violation of  31 U.S.C. § 3729(a)(1)(G), as amended in 2010.

108.  By virtue of the fact that Defendants knowingly and improperly avoided or decreased an obligation to pay or transmit money to the Government, the United States has suffered actual damages and is entitled to recover three times

the amount by which it is damaged, plus civil money penalties of not less than $5,500 and not more than $21,563 for each of the false claims presented or caused to be presented, and other monetary relief as appropriate.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in favor of the United States:

1.    On Counts I - III, under the False Claims Act, against Defendants jointly and severally for treble the amount of the United States' actual damages (including investigative costs), plus civil penalties as are allowable by law for each false claim or record and for all costs of this civil action;

2.    For all costs of this civil action; and

3.    For such other and further relief as the Court deems just and equitable.

WHEREFORE, relator Kathi Holloway demands and prays that judgment be entered in her favor:

1.    On Counts I - III, under the False Claims Act, for a percentage of all civil penalties and damages obtained from Defendants pursuant to 31 U.S.C. § 3730, reasonable attorney's fees, and all costs incurred against Defendants; and

2.    Such other relief as the Court deems just and proper.

This the 27th day of August, 2018.

**Respectfully submitted,**
**KATHI HOLLOWAY, RELATOR**
By her Attorney,

S/Brad Pigott
J. Brad Pigott, Admitted *Pro Hac Vice*
ATTORNEY FOR RELATOR KATHI HOLLOWAY

PIGOTT LAW FIRM, P.A.
775 North Congress Street
Jackson, Mississippi 39225-2725
Telephone: (601) 354-2121
Telephone (Cell): 601-940-1355
Email: bpigott@pjlawyers.com

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day of August 27, 2018, served the forgoing First Amended Complaint electronically on each attorney who has entered an appearance as counsel herein through an electronic filing with the ECF system of the Clerk of Court, and have also provided a duplicate thereof through the further electronic means of an email to the following counsel at the email address designated below for each:

COUNSEL FOR DEFENDANTS:

Katherine J. Seikaly
REED SMITH LLP
1301 K Street NW
Suite 1000 - East Tower
Washington, D.C. 20005
kseikaly@reedsmith.com

COUNSEL FOR THE UNITED STATES:

Alex Rokakis, Assistant United States Attorney, Northern District of Ohio
alex.rokakis@usdoj.gov

Guillermo J. Rojas, Assistant United States Attorney, Northern District of Ohio
guillermo.rojas@usdoj.gov

Patricia M. Fitzgerald, Assistant United States Attorney, Northern District of Ohio
Patricia.fitzgerald2@usdoj.gov

Amy D. Kossak, DOJ Civil Division
amy.d.kossak@usdoj.gov

Amy L. Likoff, DOJ Civil Division
Amy.l.Likoff@usdoj.gov

s/Brad Pigott
J. Brad Pigott