**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

United States of America, *ex rel.*
      Kathi Holloway,                          Case No. 3:10CV1875

           Plaintiff

        v.                                **ORDER**

Heartland Hospice, Inc., *et al.*,

           Defendants

This is a False Claims Act case.

Plaintiff-relator Kathi Holloway alleges that defendant HCR ManorCare, Inc. and its subsidiaries HCR Home Health Care & Hospice, LLC, Heartland Hospice Services, LLC, and ManorCare Health Services, LLC (collectively, Heartland) violated the False Claims Act (FCA), 31 U.S.C. §§ 3729, *et seq.*, by billing the government for hospice services it provided patients not qualified for such care and avoiding its obligation to repay funds so obtained.

Holloway worked for Heartland as a Regional Hospice Consultant. She claims that, during her employment, she came to believe that Heartland engaged in practices that induced employees to certify as hospice-eligible patients who were not terminally ill (and thus unqualified for hospice care) and billed Medicare and Medicaid for their treatment. Holloway further alleges that Heartland ignored its responsibility to refund the government amounts it overpaid for such improperly billed treatment.

Jurisdiction is proper pursuant to 28 U.S.C. § 1331.

Pending is Heartland's motion to dismiss (Doc. 82).[1] For the reasons that follow, I grant the motion.[2]

## Background

Heartland provides hospice services to its patients, many of whom are enrolled in Medicare or Medicaid.

## I. Statutory and Regulatory Framework

Medicare and Medicaid programs reimburse hospice providers for treatment they provide "terminally ill" patients.[3] 42 C.F.R. § 418.20(b). A patient is terminally ill if his or her prognosis "is for a life expectancy of 6 months or less if the terminal illness runs its normal course." *Id.* at §

---

[1] Defendants have requested an oral hearing on their motion. (Doc. 82). Having reviewed the briefs and the pertinent parts of the record, I conclude that oral argument is not essential to the fair and proper resolution of this case.

[2] Though both parties have, without seeking leave to do so, exceeded the page limit in this district's Local Civil Rule 7.1(f), that simply doesn't matter. I believe, though, that it's unnecessary to impose page limits or to to bother seeking leave to exceed any such limits where all that would just "get[] in the way of a lawyer trying to do his or her job as best he or she can do it." *Exact Software N.A., Inc. v. Infocon Inc.*, 2008 WL 820083 (N.D. Ohio) (Carr, J.).

But anyone who somehow someday stumbles across this *Tom Jones* aside might keep in mind that there's no such thing as too short a brief (or cross-examination). And, moreover, that sometimes the longer it gets, the less persuasive it may become. But if some attorney doesn't waste time (mine and his or hers) filing a motion seeking leave to exceed page limits or opposing same, that's fine with me.

Always better, though, to take the time as best and vigorously as one can, snipping, cutting, and pruning, pulling up the weeds, raking out the underbrush, and edging along the driveway, curb, sidewalk, around the lamppost, and walkway to the front door. The curb appeal of a well kempt yard that such wearying work brings into being is always worthwhile and has its payoff and profit.

[3] Holloway states that identical requirements apply for reimbursement for hospice services under both Medicare and Medicaid, but she cites only Medicare regulations in her complaint and brief.

418.22(b)(1). If a patient is not terminally ill, he or she is ineligible for hospice care. *See id.* at §

418.20(b).

For each treatment period, the hospice provider must obtain, as a condition precedent to

payment, a written certification from the patient's attending physician (and, for an initial ninety-

day period, the hospice's medical director) that the patient is terminally ill. *Id.* at § 418.22; 42

U.S.C. § 1395f(7). In turn, hospice providers submit CMS Form UB-04 to the government as a

claim for payment. (Doc. 69 at 10, ¶ 20). The form acknowledges that "[p]hysician's

certifications and re-certifications . . . are on file."[4]

## II. Holloway's Employment With Heartland

In November, 2009, Heartland hired Holloway as a Regional Hospice Consultant (RHC).

Her job was to evaluate Heartland providers' entitlement to payment for hospice services. To

make her evaluations, Holloway reviewed patients' clinical and insurance documentation,

including their eligibility for Medicare or Medicaid. (Doc. 69 at 12, ¶ 25). Some patients' files

were designated as "Bill Hold Chart Audits," meaning Heartland held "claims to Medicare for

payment . . . pending . . . Holloway's review." (*Id.* (internal quotations omitted)).

RHCs, including Holloway, prepared for executives' review "workbooks" discussing

patients' "clinical records and billing histories" and identifying for discharge patients who the

RHCs concluded were not terminally ill. (Doc. 69 at 14, ¶ 28). "Holloway routinely followed up"

on her recommendations and often found that the patients she identified in her workbooks "had

not been discharged but remained on hospice and continued to be the subject of claims to the

Medicare Part A and Medicaid systems." (*Id.* at 34, ¶ 72).

---

[4] CENTS. FOR MEDICARE & MEDICAID SERVS., FORM UB-04, *available at*
https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/CMS-Forms-
Items/CMS1196256.html.

In October, 2010, Holloway's employment at Heartland ended. (Doc. 69 at 12, ¶ 25).

### III. Holloway's *Qui Tam* Action

Holloway originally filed her *qui tam* complaint alleging FCA violations on August 24, 2010. (Doc. 1). After a seven and one-half-year investigation, the government filed its notice of election to decline intervention on March 1, 2018. (Doc. 55). In response to an August 6, 2018 motion to dismiss (Doc. 68), Holloway sought, and I granted, leave to amend her complaint (Doc. 70). The amended complaint (Doc. 69) is the subject of the pending motion (Doc. 82).

Holloway's amended complaint asserts that Heartland 1) presented false or fraudulent claims for payment to the government (the "presentment" claim); 2) prepared false records in support of such claims for payment (the "false records" claim); and 3) retained payments from the government to which Heartland was not entitled (the "reverse" false claim). (*See* Doc. 69 at 45-49).

In support of these claims, Holloway alleges corporate-wide practices aimed at inflating Heartland's hospice census:

- A **reward/punishment system**, whereby Heartland 1) promised certain employee groups bonuses if hospice agencies met targets for new enrollments and achieved census and billing benchmarks (Doc. 69 at 15-16, ¶ 31); 2) promised additional vacation hours to the agency with the largest census increase in its region (*id.* at 17-18, ¶ 35); and 3) threatened to terminate certain Toledo-based employees if facilities failed to meet census requirements (*id.* at 18, ¶ 36).

- **Employee training** that discouraged "clinical personnel charged with preparing [patient] documentation" from using "ship sinkers," that is, language depicting patient improvement, and instead encouraged "negative charting," or "focus[ing] . . . on purported clinical indicia of medical decline[]" as would support hospice recertification. (Doc. 69 at 22-23, ¶¶ 42-44).

- Authorizing non-physician employees to **override physician recommendations** to discharge patients from hospice care where physicians' notes indicated the patient no longer needed such care. (Doc. 69 at 27-28, ¶¶ 56-57).

Holloway submits that these practices caused employees to produce "distorted records," on which medical directors and physicians relied when "deciding whether or not to certify or re-certify" patients as hospice-eligible. (Doc. 69 at 20, ¶¶ 39-40). In turn, she asserts, Heartland submitted claims for payment that falsely represented the patients' eligibility. (*Id.* at 20, ¶ 41).

Holloway also alleges that Heartland retained funds the government paid for treating unqualified patients by:

- Instructing employees not to review **discharged patients' records** beyond the most recent billing period to determine whether the agency should have discharged such patients sooner (and, thereby, ceased billing for their treatment sooner) (Doc. 69 at 35, ¶ 76); and

- Refusing to respond to Medicare **auditors' requests** for additional documentation when "Heartland knew (or realized upon inquiry)" that subject patients "were not eligible for hospice services," causing the auditors to deny one month's worth of claims but take no further action (Doc.69 at 37, ¶ 79).

### Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* At this stage, I must "draw all reasonable inferences in favor of [plaintiffs]." *Courtright v. City of Battle Creek*, 839 F.3d 513, 520 (6th Cir. 2016).

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "[A] complaint alleging FCA violations must allege the underlying facts" in accordance with Rule 9(b). *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 641 (6th Cir. 2003) (hereinafter *Bledsoe I*) (citing *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 562-63 (6th Cir. 2003)). This means that a *qui tam* plaintiff

must "state with particularity the circumstances (*i.e.*, the time, place, and substance) surrounding the fraudulent activity." *Id.* at 642.

**Analysis**

The FCA, 31 U.S.C. § 3729, imposes civil liability on a defendant that:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] . . .

(F) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

A private individual, known as a relator, may bring a *qui tam* suit for alleged FCA violations on the government's behalf. *United States ex rel. Jones v. Horizon Healthcare Corp.*, 160 F.3d 326, 329 (6th Cir. 1998) (citing 31 U.S.C. § 3730(b)(1)). On receiving a *qui tam* complaint, the government may choose whether to participate in the case. 31 U.S.C. § 3730(a)(2). If the government declines to intervene, the relator "shall have the right to conduct the action." *Id.* at § 3730(c)(3).

Heartland argues that the FCA's public disclosure rule bars Holloway's complaint, and, alternatively, that Holloway fails to plead her claims with particularity.

**I. The Public Disclosure Bar**

A *qui tam* suit cannot proceed if "the basis of the lawsuit" has been publicly disclosed unless the relator "establish[es] [her]self as the original source of the information." *United States ex rel. Antoon v. Cleveland Clinic Found.*, 788 F.3d 605, 614 (6th Cir. 2015). This so-called "public-disclosure bar 'provides a broad sweep' and is 'wide-reaching.'" *United States ex rel.*

*Armes v. Garman*, 719 Fed. App'x 459, 462-63 (quoting *Shindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 408 (2011)).

### A. Amendments to the Public Disclosure Bar

Congress amended the public disclosure bar in March, 2010. *Id.* Because Holloway's complaint concerns conduct beginning in 2004 and ending in 2018 (*see* Doc. 69 at 11, ¶ 24), "the amended complaint is subject to both versions of the public-disclosure bar." *United States ex rel. Ibanez v. Bristol-Meyers Squibb Co.*, 874 F.3d 905, 918 (6th Cir. 2017) (citing *Antoon*, *supra*, 788 F.3d at 614-15). "But . . . any difference in statutory language is irrelevant if the outcome would be the same under either version." *Id.*

Under the pre-amendment version of the public disclosure rule:

No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (effective through March 22, 2010).

The post-amendment version of the statute is non-jurisdictional:

The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—

(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
(ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
(iii) from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(4)(A) (March 23, 2010 amendment); *see also United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430,435 (6th Cir. 2016) ("[T]he public

disclosure bar is no longer jurisdictional and instead may be pleaded as an affirmative defense.") (internal quotations and citation omitted).

The Sixth Circuit has employed the same analytical framework to both versions of the statute, *compare United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 511 (6th Cir. 2009) *with Armes*, *supra*, 719 Fed. App'x at 463. Accordingly, I likewise apply that framework here: "To determine whether [the public disclosure] bar applies, a court must consider 'first whether there has been any public disclosure of fraud, and second whether the allegations in the instant case are 'based upon' the previously disclosed fraud.'" *Poteet*, *supra*, 552 F.3d at 511 (quoting *United States ex rel. Gilligan v. Medtronic, Inc.*, 403 F.3d 386, 389 (6th Cir. 2005)) (additional internal citations and quotations omitted). "If the answer is 'no' to any of these questions, the inquiry ends, and the *qui tam* action may proceed; however, if the answer to each of the above questions is 'yes,' then [the court] must determine whether the relator nonetheless qualifies as an 'original source[.]'" *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 974 (6th Cir. 2005) (citing *Jones*, *supra*, 160 F.3d at 330).

### C. Whether Holloway's Claims Were Publicly Disclosed

"For a relator's *qui tam* action to be barred by a prior 'public disclosure' of the underlying fraud, the disclosure must have (1) been public, and (2) revealed the same kind of fraudulent activity against the government as alleged by the relator." *Poteet*, *supra*, 552 F.3d at 511 (citing 31 U.S.C. § 3730(e)(4)(A); *United States ex rel. Burns v. A.D. Roe Co.*, 186 F.3d 717, 723 (6th Cir. 1999)).

Heartland points to four categories of purported public disclosures:

1. The Heartland South Carolina Cases: Three nurse-plaintiffs simultaneously sued HCR ManorCare and two Heartland subsidiaries not named in this case in the District of South Carolina alleging FCA claims for "fraudulent[] . . . billing for hospice services[,]" wrongful termination claims, and other tort claims (Doc. 82-1 at 13

(citing Doc. 82-6; Doc. 82-7; Doc.82-8).[5] The court unsealed plaintiffs' original complaints on July 9, 2007, and plaintiffs later amended their complaints to omit the FCA claims. (*See* Doc. 82-10; Doc. 82-11; Doc. 82-12). On November 12, 2008, the parties jointly stipulated to dismissal. (Doc. 82-13).[6]

2.  The SouthernCare settlement: In January, 2009, the DOJ settled FCA claims with SouthernCare Inc. for allegedly billing Medicare for treatment it provided patients not qualified for hospice. (Doc. 82-1 at 16-17 (citing Doc. 82-14))

3.  The OIG report: The Health and Human Services Office of Inspector General (OIG) issued a report in September, 2009 about Medicare compliance for hospice care in nursing facilities. The report found that four percent of the sample claims reviewed "did not meet certification of terminal illness requirements." (Doc. 82-16 at 5).

4.  The CLP complaint: On September 30, 2009, Holloway filed a *qui tam* suit against another of her former employers, CLP Healthcare Services, Inc., and its affiliates (collectively, CLP). She alleged that CLP admitted as hospice-qualified patients not eligible for such care. (*See* Doc. 82-2 at 4-5).[7]

---

[5] The cases are *Litwin v. HCR ManorCare, Inc.*, 2:07CV681 (D.S.C.) (Doc. 82-6); *Olson v. HCR ManorCare, Inc.*, 2:07CV680 (D.S.C.) (Doc. 82-7); and *Williams v. HCR ManorCare, Inc.*, 2:07CV682 (D.S.C.) (Doc. 82-8). I collectively refer to these cases as the "Heartland South Carolina cases" or, simply, the "South Carolina cases."

[6] The subsidiaries named in the Heartland South Carolina cases are Heartland Home Health Care & Hospice and Heartland Hospice Services, Inc. Plaintiffs do not argue that Heartland Hospice Services, Inc. is the same entity as Heartland Hospice Services, LLC, which is named in this action.

[7] "[T]he traditional rule is that when a district court considers matters outside the pleadings in ruling on a motion to dismiss under Rule 12(b)(6), its ruling is treated as one [on a motion for summary judgment] under Rule 56(c)." *Yeary v. Goodwill Indus.-Knoxville, Inc.*, 107 F.3d 443, 445 (6th Cir. 1997). But, "[a]t this preliminary stage in litigation, courts may also consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies[]" without converting defendants' motion into one for summary judgment. *Armengau v. Cline*, 7 Fed. App'x 336, 344 (6th Cir. 2001).

I may consider the cited materials without converting Heartland's motion to dismiss into a motion for summary judgment because they are public record. Neither party suggests otherwise.

## 1. The Heartland South Carolina Cases Are Public

Holloway argues that the Heartland South Carolina Cases are not "public" under 31 U.S.C. § 3730(e)(4)(A)(i) as amended.

Because the government declined to intervene in the Heartland South Carolina cases, those cases meet the statutory definition only if relators were the government's agents.[8] *Id.* Holloway submits that they were not. I disagree.

District courts are split as to whether a *qui tam* relator is the government's agent where the government opts out of the case.

Holloway cites *United States ex rel. Forney v. Medtronic, Inc.*, 327 F. Supp. 3d 831 (E.D. Pa. 2018), in arguing that a relator is not the government's agent where it declines to intervene in the action. (Doc. 83 at 33, n.65). The court in that case determined that "a *qui tam* relator is not the government's agent" because 1) "there is no indication that the government has authorized the relator to act in its place as a representative[]" and 2) the government relinquishes control when it declines to intervene in the case. 327 F.3d at 842-44 (internal citations omitted).

In *United States ex rel. Gilbert v. Virginia College, LLC*, 305 F. Supp. 3d 1315, 1323-24 (N.D. Ala. 2018), the court reached the opposite conclusion. The court in *Gilbert* explained that a relator acts as the government's agent despite its declination to intervene because it "is the real party in interest and the relator is the assignee of the Government's damages claim." *Id.* at 1324. Moreover, the court noted, the government retains "a fair amount of control over *qui tam* litigation[:]"

> [T]he Government still receives copies of all pleadings and deposition transcripts, can move to stay discovery if it interferes with an ongoing criminal or civil investigation, and has the right to approve or reject a stipulated dismissal. The

---

[8] This distinction only matters insofar as Holloway's claims are based on Heartland's conduct after the March, 2010 amendment. *Ibanez*, *supra*, 874 F.3d at 918.

government may even intervene at a later date upon a showing of good cause and subsequently dismiss a case over the relators' objections.

*Id.* (citing § 3730(b)(1), (c)(2)(D)(3), (c)(4)) (intertextual citations omitted).

A majority of courts have adopted this reasoning. *E.g.*, *United States ex rel. Vitale v. MiMedx Grp., Inc.*, --- F. Supp. 3d ----, 2019 WL 2122754, *6 (D.S.C.) (citing *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 772 (2000)); *United States ex rel. Folliard v. Comstor Corp.*, 308 F. Supp. 56, 77 n.13 (D.D.C. 2018) (internal citations omitted); *accord Bagley v. United States*, 963 F. Supp. 2d 982 (D.D.C. 2013) (explaining, in tax case, that "the relator effectively stands in the shoes of the government to prosecute the FCA claim[]" and "[i]n doing so, the relator acts as an agent or private attorney general for the government").

I likewise find the reasoning in *Gilbert* persuasive.

To conclude otherwise would render the phrase "or its agent" in § 3730(e)(4)(A)(i) meaningless. Under the analysis in *Forney*, *supra*, 327 F. Supp. 3d 831, a *qui tam* relator is the government's agent only if the government intervenes in the case. But the statute deems a case public if *either* the government *or* its agent is a party. Who, if not the private relator, is the government's agent? *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant[.]") (internal citation, quotations, and ellipses omitted).

Accordingly, the Heartland South Carolina cases are "public" under the amended statute.

## 2. Whether the Materials Disclosed Holloway's Allegations

The Sixth Circuit has identified "[t]wo types of disclosures . . . sufficient to put the government on notice of fraud." *Antoon*, *supra*, 788 F.3d at 616 (citing *Poteet*, *supra*, 552 F.3d at 512). "First, if the information about both a false state of facts and the true state of facts has been disclosed, [a court] should find that there has been adequate public disclosure because fraud

is implied." *Gilligan*, *supra*, 403 F.3d at 389 (citing *Dingle v. Bioport Corp.*, 388 F.3d 209, 214-15 (6th Cir. 2004)). This is known as the "X + Y = Z" formula: X represents the true state of facts; Y represents the false state of facts; and Z represents the allegation of fraud. *Poteet*, *supra*, 552 F.3d at 512, n.5 (internal quotations and citations omitted). "Second, if there has been a direct allegation of fraud, [a court] will find a public disclosure because such an allegation, regardless of its specificity, is sufficient to put the government on notice of the potential existence of fraud." *Id.* at 513 (citing *Gilligan*, *supra*, 403 F.3d at 389; *Dingle*, *supra*, 388 F.3d at 215).

### a. The Heartland South Carolina Cases Disclosed Holloway's Allegations

Heartland argues that the Heartland South Carolina cases, standing alone, publicly disclosed Holloway's claims. Holloway responds that those cases do not reveal the fraud she alleges because her complaint alleges a broader scheme, names different Heartland entities, and arises in a different jurisdiction.

I agree with Heartland.

First, the South Carolina cases directly alleged that the same corporate parent, HCR ManorCare, fraudulently submitted claims for hospice care it provided unqualified patients. Accordingly, those cases, "regardless of [their] specificity," publicly disclosed Holloway's allegations. *Poteet*, *supra*, 552 F.3d 513 (internal citations omitted).

Next, the Sixth Circuit has found the type of differences Holloway identifies between her case and the Heartland South Carolina cases immaterial to this inquiry.

For example, in *United States ex rel. McKenzie v. BellSouth Telecommunications, Inc.*, 123 F.3d 935, 939-40 (6th Cir. 1997), the court deemed irrelevant differences in the victims of the alleged fraud, the entities that committed the alleged fraud, and the jurisdictions where prior

claims arose. The court held that two *qui tam* cases disclosed the relator's allegations although one case arose in a different federal jurisdiction against another of the defendant's divisions that served customers in another region of the country, and another case arose in state court but alleged fraud against a subset of customers not implicated in relator's case.

In *Poteet*, *supra*, 552 F.3d at 512-13, the court likewise found that a California state wrongful discharge case disclosed relator's FCA claims in Tennessee federal court because both cases asserted that defendant bribed medical professionals with vacations disguised as conferences and "think tanks." The court so held because the prior suit "presented enough facts to create an inference of wrongdoing . . . and thereby was sufficient to put the government on notice of the 'possibility of fraud.'" *Id.* at 513 (internal quotations and citations omitted).

So too here. Holloway, like the Heartland South Carolina plaintiffs, claims that Heartland fraudulently requested payment for hospice services when it knew patients were not hospice eligible. The differences in jurisdiction, breadth, and subsidiaries involved are immaterial to the question of whether those cases disclosed Holloway's allegations.

The South Carolina cases sufficiently put the government on notice of the same type of fraud Holloway alleges, and, therefore, those cases publicly disclosed her claims.

### b. Remaining Materials

Heartland argues that the remaining materials it cites, "in the aggregate" with the Heartland South Carolina cases, publicly disclosed Holloway's claims. (Doc. 82-1 at 20). But only the OIG report further marks, however slightly, the trail of fraud in this case.

### i. The OIG Report

The OIG report "present[ed] the present state of affairs as they [were,]" *see Dingle*, *supra*, 388 F.3d at 214, and therefore serves as the X in X + Y = Z formula of fraud. Viewed

alongside the Heartland South Carolina cases, "or the allegations of fraud itself (Z)[,]" s*ee United States ex rel. Digital Healthcare, Inc. v. Affiliated Computer Services, Inc.*, 778 F. Supp. 2d 37 (D.D.C. 2011), the OIG report publicly discloses Holloway's claims.

In *Dingle*, *supra*, 388 F.3d at 213-14, the court held that a journal article constituted the X in the formula because it explained that "changes had been made" to the anthrax vaccine but did not assert that defendant made such changes without FDA approval. Similarly, here, the OIG report sets out the then-current state of affairs – four percent of Medicaid claims hospice providers submitted did not meet the "terminal illness" requirement – but does not state or imply that providers knowingly billed the government for hospice services provided to unqualified patients. (Doc. 82-16 at 5).[9]

Likewise, here, the OIG report, taken with the Heartland South Carolina cases, reveals the fraud Holloway alleges. *See Dingle*, *supra*, 388 F.3d at 214 (explaining journal article must be viewed alongside other materials to constitute public disclosure); *Dig. Healthcare, Inc.*, *supra*, 778 F. Supp. 2d 37 (explaining that Z may provide second necessary element to X).

### ii. The SouthernCare Settlement and the CLP Complaint

Neither the SouthernCare settlement nor the CLP complaint, however, publicly discloses Holloway's claims.

Heartland discusses, at length, the similarities between those materials and Holloway's case, including that Holloway was the relator in the case against CLP. Despite the identified

---

[9] Indeed, the OIG report attributed the certifications' shortcomings to several alternative causes: "the certifications did not specify that the individuals' prognoses were for life expectancies of 6 months or less if the terminal illness ran its normal course; they were not supported by clinical information and other documentation in the medical records; or they were not signed by physicians." (Doc. 82-16 at 5).

similarities, neither the SouthernCare settlement nor the CLP complaint names, or even mentions, HCR ManorCare or any of its subsidiaries.

Nonetheless, Heartland encourages me to find that these materials, combined with the other disclosures, implicate Heartland because the Heartland South Carolina cases identify HCR ManorCare, and the remaining materials expose industry-wide fraud. I decline to take this approach.

As Heartland admits, the Sixth Circuit has not "not addressed[,]" much less adopted, an industry-wide theory of public disclosure. (Doc. 82-1 at 12).

Moreover, the cases on which Heartland relies in asking me to apply such a theory are distinguishable. (*Id.* (collecting cases)). I address each of those cases in turn.

The court in *United States ex rel. Ambrosecchia v. Paddock Laboratories, LLC.*, 2015 WL 5605281, *5 (E.D. Mo.), found that a prior complaint naming the defendant-drug company publicly disclosed relator's claims in part because that complaint listed "some of the same drugs that [were also] the subject of" relator's complaint. But, here, Holloway does not identify a discrete set of products or services (other than general hospice care) common between this case and the prior cases as would allow me to tie the alleged wrongdoers together.

In *United States ex rel. Gear v. Emergency Medical Association of Illinois, Inc.*, 436 F.3d 726, 728-29 (7th Cir. 2006), the Seventh Circuit held that a report to Congress and subsequent government enforcement activity revealed that "*all* (or almost all) teaching hospitals" engaged in the conduct relator alleged. Because relator "added nothing to the public disclosure except the name of the teaching hospital," the public disclosure bar applied. *See United States ex rel. Godlberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 935-36 (7th Cir. 2012) (describing investigation that publicly disclosed allegations in *Gear*, 436 F.3d at 728).

Here, however, the materials Holloway cites do not show this kind of widespread misconduct or broad government enforcement efforts. Rather, the SouthernCare settlement and CLP complaint reveal allegations of wrongdoing against a handful of industry participants *Cf. also United States ex rel. Pritsker v. Sodexho, Inc.*, 2009 WL 579380 (E.D. Pa.) (cited by defendants) (applying public disclosure bar where series of government audits revealed "common industry practice").

Finally, at least some courts applying an industry-wide public disclosure theory have done so only as to "insular" industries with easily identifiable players. *E.g.*, *United States ex rel. Reed v. Keypoint Gov't Sols.*, 923 F.3d 729, 740 (10th Cir. 2019) (applying industry-wide public disclosure theory in three-business industry where government previously investigated defendant's employee for the fraud alleged); *see also Gear*, 436, F.3d at 728-29 (investigation revealed fraudulent practices at "the nation's 125 medical schools"); *United States ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 237-38 (3d Cir. 2013) (applying industry-wide public disclosure theory to "an industry of one" where defendants "were the only [players] during their respective contractual terms") (cited by defendants); *United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568 (10th Cir. 1995) (barring *qui tam* suit where GAO report and congressional hearing implicated two laboratories in eight-laboratory industry). It does not appear, and, indeed, Heartland does not argue, that the hospice industry is similarly insular.

Because neither the CLP complaint nor the SouthernCare settlement implicates Heartland, they do not publicly disclose Holloway's claims.

## D. Holloway's Complaint is Not Based Upon the
## Heartland South Carolina Cases and the OIG Report

Having found that the Heartland South Carolina cases and the OIG report publicly

disclosed Holloway's allegations, I must determine whether Holloway's complaint is "based

upon" those public disclosures.

To meet the "based upon" standard, a relator's complaint must share a "substantial

identity" with a public disclosure.[10] *See United States ex rel. McKenzie*, *supra*, 123 F.3d at 940.

"There need not be a complete identity 'even as to time, place, and manner" between the

publicly disclosed allegations or transactions and the later *qui tam* complaint in order to trigger

the public-disclosure bar." *Armes*, *supra*, 719 Fed. App'x 459, 463 (6th Cir. 2017) (quoting

*Poteet*, *supra*, 552 F.3d at 514). Rather, "a private suit is based upon a public disclosure when

the allegations are substantially similar to the public disclosure, even if the relator adds details."

*United States ex rel. Antoon v. Cleveland Clinic Found.*, 978 F. Supp.2d 880, 891, (S.D. Ohio

2013) (hereinafter *Antoon I*) (citing *Goldberg*, *supra*, 680 F.3d at 934), *aff'd*, 758 F.3d 605 (6th

Cir. 2016). Accordingly, "[a]ny 'action based *even partly* upon public disclosures' will be . . .

barred." *Poteet*, *supra*, 552 F.3d at 514 (quoting *id.*) (emphasis supplied).

Holloway argues that her allegations are not substantially similar to those in the

Heartland South Carolina cases. This is so, she submits, because the Heartland South Carolina

cases related to a discrete group of patients at one local hospice agency during a six-month

period in 2004, (Doc. 83 at 32), whereas, here, she alleges corporatewide misconduct.

---

[10] The March, 2010 amendments did not alter this "substantially similar" analysis. Rather, the
amendment codified the "based upon" standard. *See United States ex rel. Osheroff v.
HealthSpring, Inc.*, 938 F. Supp.2d 724, 732 n.10 (M.D. Tenn. 2013).

Heartland disagrees. It contends that Holloway's amended complaint "is merely a dressed-up reproduction of her Original complaint, which . . . was a regurgitation of public disclosure from the [Heartland South Carolina] Cases . . . and the OIG Report." (Doc. 82-1 at 19).

I agree with Holloway.

At bottom, Holloway alleges the same misconduct that the South Carolina relators described: defendants fraudulently certified that patients unqualified for hospice care as so qualified. But, because Holloway's complaint alleges a complex, sophisticated scheme through which Heartland allegedly perpetrated that fraud, it is not based upon the Heartland South Carolina plaintiffs' straightforward allegations of fraud.

Courts have cautioned against comparing public disclosures with *qui tam* complaints using "a very high level of generality[.]" *Goldberg*, *supra*, 680 F.3d at 935. Rather, where a "*qui tam* suit[] . . . rest[s] on genuinely new and material information[,]" it survives the public disclosure bar. *Id.* at 936.

For example, in *Goldberg*, *supra*, 680 F.3d at 934-36, the relator, like the plaintiff in *Gear*, alleged that a teaching hospital improperly billed for medical residents' services. But, unlike in *Gear*, the *Goldberg* relator claimed that defendant billed for such services although attending physicians did not supervise all "critical portions of the procedure" and were not "immediately available," as the Medicare regulations require. *See* 680 F.3d at 935 (quoting 42 C.F.R. § 415.172(a)(1)) (internal quotations omitted). The court declined to view the government report described in *Gear* so generally as to find that its conclusions that teaching hospitals overbilled for residents' work as barring relator's new theory of fraud. *See id.* at 935-36.

Similarly, the court in *Leveski v. ITT Educational Services, Inc.*, 719 F.3d 818 (7th Cir. 2013) held that a prior lawsuit against the same defendant did not bar the relator's complaint. The previous relators alleged that defendant violated the Higher Education Act (HEA) by compensating employees based on enrollment and financial aid quotas and, in turn, falsely certified HEA compliance to the government. Relator, however, unveiled a "new tactic[]," that is, a "sham" system ostensibly evaluating employees based on metrics such as attitude and appearance but actually evaluating employees based on impermissible quotas. *Id.* at 831, 833.

Holloway's "allegations" likewise "differ in both degree and in kind from" the Heartland South Carolina plaintiffs' claims. *See United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 580 (9th Cir. 2016) (relator's complaint alleging that federal contractor falsely certified compliance with project specifications was not based upon news articles discussing defendant's mismanagement of project); *cf. Antoon I*, *supra*, 978 F. Supp. 2d at 899 (holding materials showing physician's financial relationship with the manufacturer and patients' dissatisfaction with the physician's recommendations for robotic surgery were "not at such a high level of generality" as to avoid the public disclosure bar on relator's claim that manufacturer violated anti-kickback provision of FCA).

The Heartland South Carolina plaintiffs' allegations were simple: their superiors refused to discharge patients despite knowing they did not qualify for hospice care.

Holloway's allegations are more complex. She describes a system designed to increase the hospice census and avoid repaying the government for services provided to unqualified patients: a system of incentives and punishment, training techniques, authority to override physician recommendations, and turning a blind eye to patients' ineligibility dates. Her

complaint is "different enough" from the Heartland South Carolina plaintiffs' straightforward allegations to survive the public disclosure bar.[11] *Leveski*, *supra*, 719 F.3d at 831.

In light of this conclusion, I need not determine whether Holloway is an original source.

## II. Pleading With Particularity

Heartland alternatively argues that Holloway's claims do not meet the Rule 9(b) particularity standard. I agree.

### A. The Presentment and False Record Claims

A relator establishes a "presentment" claim under the FCA by showing that "(1) a person present[ed], or cause[d] to be presented, a claim for payment or approval; (2) the claim [wa]s false or fraudulent; and (3) the person's acts [were] undertaken 'knowingly,' *i.e.*., with actual knowledge of the information, or with deliberate ignorance or reckless disregard for the truth or falsity of the claim." *Bledsoe I*, *supra*, 342 F.3d at 640.

#### 1. Holloway Does Not Identify Specific False Claims or Records

"In order to comply with Rule 9(b) in FCA cases, [the Sixth Circuit] require[s] the relator to identify a specific false claim in the complaint, or, where the complaint describes a complex and far-reaching fraudulent scheme, a representative example of a fraudulent claim." *United States ex rel. Hockenberry v. OhioHealth Corp.*, 2017 WL 4315016, *2 (citing *Bledsoe I*, *supra*, 501 F.3d at 504-05, 509-10).

Holloway argues that she has met her burden because she describes corporate-wide practices amounting to a fraudulent scheme. (*See* Doc. 83 at 11-16). She is incorrect.

---

[11] Without the Heartland South Carolina cases' Z, the OIG report, standing alone as X, cannot bar Holloway's claims. *See Dingle*, *supra*, 388 F.3d at 214.

In her complaint, Holloway provides no examples of fraudulent claims Heartland submitted. Yet, she argues that her allegations are sufficient when viewed alongside a list naming patients she determined were not terminally ill but remained on the hospice rolls.[12] (*See* Doc. 83 at 11-17; Doc. 1-1). But the list neither identifies fraudulent claims Heartland submitted for treating those patients nor provides facts showing those patients did not qualify for hospice care. The list simply gives background information – the patients' "name[s], places of service, core clinical diagnoses . . ., and 'start of care' dates[,]" – and concludes that the patients were "the subject of legally and medically false claims to Medicare beginning on the 'start of care' date[s.]" (Doc. 83 at 28).[13]

The cases Holloway cites in arguing her claims are sufficient require that she state facts showing that Heartland submitted fraudulent claims. (*See* Doc. 83 at 11-17 (citing *United States ex rel. Landis v. Hospice Care of Kansas, LLC*, 2010 WL 5067614 (D. Kan.); *United States ex rel. Hinkle v. Caris Healthcare LP*, 2017 WL 3670652 (E.D. Tenn.); *United States ex rel. Fowler v. Evercare Hospice, Inc.*, 2015 WL 5568614 (D. Colo.)).

The court in *Landis*, *supra*, 2010 WL 5067614, *6, held that the government met its pleading burden in part because it described, among other things, "specific instances related to [a 27-patient sample] that [it] allege[d] caused false claims, . . . the false claims submitted for payment[,] . . . when claims were submitted; and when the alleged violations occurred."

---

[12] Holloway first submitted the patient list as an exhibit to her original complaint. She reincorporates the list as an exhibit to her amended complaint. (*See* Doc. 69 at 38-39, ¶ 82). Because the list contains confidential patient information, it remains under seal.

[13] The amount of information as to each patient varies. Indeed, the list omits the hospice locations, diagnoses, or start of care dates for some patients and adds the end of care dates for others. (*See* Doc. 1-1).

Similarly, the government in *Hinkle*, *supra*, 2017 WL 3670652, *3, identified fraudulent billings and alleged that defendant's auditor found sixteen patients had "questionable" hospice eligibility. The court denied defendant's motion to dismiss because the government explained "why the auditor" determined the patients were ineligible and identified claims submitted for their treatment. *Id.*

Finally, the court in *Fowler*, *supra*, 2015 WL 5568614, *11, granted in part and denied in part a motion to dismiss relator's FCA claims. The court denied the motion as to one group of patients because relator alleged that defendants billed the government for hospice services after Medicare rejected prior claims, deeming those patients ineligible. But the court granted the motion as to another patient group for whom Medicare did not reject defendants' claims because "[r]elators' allegations d[id] not include sufficient facts that show who determined [their] ineligibility[.]" *Id.* at *11.

The background information in the patient list does not provide the information these cases found critical. Indeed, the list neither describes claims Heartland submitted for the listed patients' care nor explains why the patients were ineligible for hospice. Holloway's presentment and false record claims, therefore, fall short of the Rule 9(b) burden.

## 2. There Is Not a Strong Inference That Heartland Submitted False Claims

Holloway alternatively argues that the facts she has alleged "justify 'a strong inference that a claim was submitted[.]'" (*See* Doc. 83 at 29 (quoting *Prather*, *supra*, 838 F.3d at 769-70)).

Sixth Circuit case law "suggest[s]" that a court may infer a strong inference that defendant submitted fraudulent claims "when a relator alleges specific personal knowledge that

relates directly to billing practices." *Id.* at 769 (citing *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 471 (6th Cir. 2011)).

> This could include personal knowledge that claims were submitted by Defendants for payment or other personal knowledge of billing practices or contracts with the government, as well as personal knowledge that was based either on working in the defendants' billing departments, or on discussions with employees directly responsible for submitting claims to the government.

*Id.* (internal quotations and citations omitted).

"Personal knowledge of the allegedly fraudulent *scheme* is not enough to warrant application of the relaxed standard." [14] *United States ex rel. Petkovic v. Founds. Health Sols., Inc.*, 2019 WL 251556, *4 (N.D. Ohio) (Lioi, J.) (emphasis supplied) (citing *United States ex rel. Eberhard v. Physicians Choice Lab. Servs., LLC*, 642 Fed. App'x 547, 552-53 (6th Cir. 2016)). Holloway must also show knowledge of "submission of specific fraudulent claims." *Eberhard*, *supra*, 642 Fed. App'x at 552 (citing *Chesbrough*, *supra*, 655 F.3d 461). This is so because "[t]he FCA attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the *claim for payment*." *Id.* (quoting *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 878 (6th Cir. 2006)) (emphasis supplied).

In *Prather*, *supra*, 838 F.3d at 769, the relator's job required that she review a "backlog" of claims for submission to Medicare. The court applied an inference that the defendant submitted claims pursuant to the scheme relator described because she alleged her "detailed knowledge of the billing and treatment documentation related to the submission of requests for final payment [and] specific allegations regarding requests for anticipated payment." *Id.* at 770.

---

[14] The Sixth Circuit at times referred to this rule as a "relaxed" pleading standard. But, in *United States ex rel. Hirt v. Walgreen Co.*, 846 F.3d 879, 881 (6th Cir.) the court backed away from that terminology as misleading: "[O]ur repetition of [the word 'relax'] . . . runs the risk of misleading lawyers and their clients. We have no more authority to 'relax' the pleading standard established by Civil Rule 9(b) than we do to increase it."

The *Prather* court deemed critical "th[e] level of detail regarding: (1) specific identified *claims* for payment that (2) the relator reviewed for billing-related purposes." *Id.* (internal citation omitted) (emphasis added).

Here, Holloway reviewed patients' documentation – including their charts and their billing histories – for a billing-related purpose: "to apply Medicare rules governing any hospice's entitlement to be paid for hospice services[.]" (Doc. 69 at 12, ¶ 25).

But Holloway's allegations regarding specific claims for payment do not match the level of detail in *Prather*.

The *Prather* relator identified four patients for whom the defendants submitted requests for anticipated and final payment and specified: the services received, the start and end dates of service, the date of the allegedly fraudulent certification, the dates defendants requested payment, and the amounts paid or billed. 838 F.3d at 758-59. She also provided spreadsheets listing over 1,200 claims that she alleged were fraudulent and, for each such claim, identified the patient, certification period, servicing network, and servicing community. *Id.* at 759.

The patient list Holloway cites falls short of this level of detail.

Critically, the list does not describe claims for payment. It gives information about the patients listed but omits information in the *Prather* four-patient sample, such as the amounts billed and/or paid, the Medicaid or Medicare certification dates, and the specific services provided. Yet Holloway, in blanket fashion, alleges that Heartland "had begun submitting monthly claims" as of each patient's "start of care date." (Doc. 69 at 39, ¶ 82).

Holloway's blanket allegation and her failure to give detail about the allegedly fraudulent billings distinguish her claims from those in *Prather*. I therefore join my colleagues throughout

the Sixth Circuit and decline to apply the inference from that case here. *See Petkovic*, *supra*, 2019 WL 251556 at \*3 (noting the Sixth Circuit has so declined "in all other cases").

## B. The Reverse False Claim

Holloway's reverse false claim is likewise insufficiently pled.

"The reverse-false-claims provision of the False Claims Act makes liable 'any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." *Prather*, *supra*, 838 F.3d at 774. "Section 3719(a)(1)(G) requires a relator to allege facts that show defendants received overpayments from the government and failed to refund those payments." *Ibanez*, *supra*, 874 F.3d at 916 (citing 31 U.S.C. § 3719(a)(1)(G); *Prather*, *supra*, 838 F.3d at 774). "Alternatively, a section 3729(a)(1)(G) violation is made out if the relator pleads adequate proof that the defendant made a false record or statement at a time that the defendant owed to the government an obligation'—a duty to pay money or property." *Id.* (quoting *Chesbrough*, *supra*, 655 F.3d at 473) (internal quotations and additional citations omitted).

Holloway has not "[pled] facts that show defendants received overpayment, much less that they retained it." *Ibanez*, *supra*, 874 F.3d at 917.

First, Holloway claims that Heartland violated the FCA by refusing to review patients' previous billings beyond the most recent billing cycle to determine whether it owed refunds. She points to two examples of this practice at work: 1) Holloway's superior instructed her not to review prior benefit periods for a patient Holloway concluded was hospice ineligible to determine the patient's ineligibility date (Doc. 69 at 35-36, ¶ 77); and 2) Holloway informed a

superior that Heartland should refund all amounts obtained for treatment it provided four patients she determined were not terminally ill, but the superior reviewed the patients' records, and Heartland issued no refund. (*Id.* at 36, ¶ 78).

In *United States ex rel. Rahimi v. Rite Aid Corp.*, 2019 WL 1426333, *5-*7 (E.D. Mich.), the court found that relator adequately pled a reverse false claim because he identified bills to the government charging Medicare/Medicaid participants more for generic drugs than defendant charged participants in its discount drug program.

Here, however, Holloway alleges no facts showing overpayment. She identifies no claims Heartland submitted for care it provided to the identified patients, much less facts (beyond her own bald conclusions) showing that the patients did not qualify for hospice care. Accordingly, her first reverse false claim theory fails as insufficiently pled. *See United States ex rel. Crockett v. Complete Fitness Rehab., Inc.*, 721 Fed. App'x 451, 459 (6th Cir. 2018) (dismissing reverse false claims count as dependent on submission of fraudulent billings); *Roycroft*, *supra*, 722 Fed. App'x at 408 (same).

Holloway's alternative theory likewise fails. She claims that, in 2010, a Heartland vice president directed her to provide a limited response to an audit request so the auditor would issue a limited penalty but make no further inquiry. (Doc. 69 at 38, ¶ 80). But, as with her first theory, Holloway does not tie this practice – or her superior's instructions – to a claimed overpayment or Heartland's retention thereof. (*See id.*).

Accordingly, Holloway has not pled her reverse false claim with particularity.

### III. Dismissal With Prejudice

Defendants ask me to dismiss Holloway's complaint with prejudice. Holloway does not object to this request.

Generally, "a district court 'should freely give leave to amend when justice so requires[.]'" *United States ex rel. Roycroft v. Geo Grp., Inc.*, 722 Fed. App'x 404, 408 (6th Cir. 2018) (quoting Fed. R. Civ. P. 15(a)(2)). But "the district court must have before it the substance of the proposed amendment to determine whether 'justice so requires.'" *Id.* (citing *Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir. 2017)). Accordingly, "a district court does not abuse its discretion" in dismissing a complaint with prejudice "where . . . the plaintiff never sought leave to amend." *Id.* (citing *Islamic Ctr. of Nashville v. Tennessee*, 872 F.3d 377, 387 (6th Cir. 2017); *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1041 (6th Cir. 1991)).

Holloway sought leave to amend her original complaint after Heartland filed its first motion to dismiss, and I allowed the amendment. But, here, faced with another motion to dismiss, she neither seeks further amendment nor submits a proposed amended complaint. I therefore grant Heartland's request that the amended complaint be dismissed with prejudice.

## Conclusion

It is, therefore,

ORDERED THAT

1. Defendants HCR ManorCare, Inc., HCR Home Health Care & Hospice, LLC, Heartland Hospice Services, LLC, and ManorCare Health Services, LLC's motion to dismiss (Doc. 82) be, and the same hereby is, granted; and

2. This case (Doc. 69) be, and the same hereby is, dismissed with prejudice.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge